Subtractus, Inc. d/b/a Ampersand
999 York Road
Guelph, Ontario
Canada, N1E 6Y9,

        Plaintiff,

    v.                              Case No. _____

Best Graphics Group Properties, LLC
W222 N600 Cheaney Drive
Waukesha, WI 53186,

        Defendant.

## COMPLAINT

Plaintiff Subtractus, Inc. d/b/a Ampersand ("Ampersand"), by its attorneys Quarles & Brady LLP, for its Complaint against Defendant Best Graphics Group Properties, LLC ("Best Graphics"), states as follows:

### Introduction

1.    This is a dispute in which Best Graphics' made false, deceptive, and/or misleading representations to Ampersand to induce Ampersand to enter a contractual agreement to purchase defective machinery and Ampersand now seeks to enforce its rights under common law and Wisconsin's Deceptive Trade Practices Act.

### Parties, Jurisdiction, and Venue

2.    Plaintiff Subtractus, Inc., which does business as Ampersand is a corporation with its principal place of business located at 999 York Road, Guelph, Ontario, Canada, N1E 6Y9.

3. Defendant Best Graphics Group Properties, LLC is a Wisconsin limited liability company with its principal place of business located at W222 N600 Cheaney Drive, Waukesha, Wisconsin, 53186.

4. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different countries. This Court therefore has jurisdiction of this matter by virtue of 28 U.S.C. § 1332.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District and because the parties have agreed contractually that any action on or related to the machinery shall be venued in the state or federal courts located in the State of Wisconsin.

## Facts

6. In September, 2018 Ampersand's President, Damian McDonald inquired into purchasing a used Heidelberg ST-400 Saddle Stitcher (the "Machine") from Best Graphics by emailing Best Graphics' Service Manager, Gary Martin ("Mr. Martin"), and Best Graphics' Sales Representative, A.J. Brahm ("Mr. Brahm").

7. The Machine is designed to bind and staple paper products, such as books, pamphlets, and magazines.

8. Mr. McDonald viewed the Best Graphics' website, which listed the Machine as low-usage, specifically stating "Approx. Book Count: 75,000,000 - *Single Shift Operation*."

9. On September 28, 2018, Mr. Martin explained that Mr. McDonald could not inspect the Machine because it was dismantled, but "a video of it running a job pre-tear down" was available on Best Graphics' website.

10.     After reviewing the video, Mr. McDonald was concerned about the Machine's performance and emailed Mr. Brahm on October 9, 2018, stating "the machine is running quite slow for an ST400, are there any mechanically/electronically limiting issues that you're aware of that I need to plan for?"

11.     That same day, on October 9, 2018, Mr. Brahm responded to Mr. McDonald stating "No issues governing the machine's speed; frankly, they are a union shop - which might have something to do with it - and also the fact that they frequently run very small size formats (which we know from their Osako demo days, purchase order), so perhaps they ran slower to ensure all pockets were 'firing' without misfeeds."

12.     On October 12, 2018, Mr. McDonald emailed Mr. Brahm expressing concerns, as outlined below:

**Author:** Damian McDonald
**Author email:** damian@ampersand.ca
**Subject:** ST400
**Sent datetime:** 10/12/2018 15:25:28

Hi AJ,

I'm thinking that it might not be worth coming down to see the machine, as it is on skids there isn't a lot I can inspect other than cosmetic and consumables like belts etc...

I want to make this deal work and move forward. I have a few more questions/concerns:

1) I've learned that this machine requires a tremendous amount of compressed air. I will have to invest $20k in a new twin screw compressor to accommodate the load. What is the absolute best price you can do for the machine shipped and installed?
2) Will you guarantee that when your installer leaves the machine is up and running?
3) Is there anything that you know not to be working in terms of the automated setup of the machine?
4) Can you have one of your guys check the face trim stops and let me know if there is any play in them?

Thanks,
Damian


Damian McDonald
President
**ampersand** print & marketing execution experts



**e** damian@ampersand.ca
**c** 519 993 1195
**o** 519 515 0055

13. After receipt of the October 12, 2018 email, Mr. Brahm called Mr. McDonald and said that he would circle back with his team and Raff Printing, Inc. ("Raff Printing") to make sure there was a clear understanding on the Machine's functionality by speaking with the operator to determine which components were operational and which components were not working. Mr. Brahm's statement reassured Mr. McDonald regarding his concerns outlined in the October 12, 2018 email.

QB\56410280.2

14.     On October 15, 2018, Mr. Brahm emailed Mr. McDonald forwarding a formal ST-400 machine quotation, and making several observations regarding the Machine, as outlined below:

**Author:** A.J. Brahm
**Author email:** ajb@bestgraphics.net
**Subject:** Best Graphics - Heide ST-400 Stitcher Quotation
**Sent datetime:** 10/15/2018 22:00:44

Hi Damian,

Hope your week's off to a good start. Attached, as promised, is the formal ST-400 machine quotation.

A few observations:

1.  I have identified that the Stitcher came with SB-50 Hohner heads; I see (2) on the machine, and will clarify with Gary Martin that there is a skid with miscellaneous spares, and Stitch Heads; there should be (4) total, as it's a machine that can do 2-up work

2.  There are (2) Flat-fed Feeders, and (6) Upright Feeders – for a total of (8) Signature Feeders – per my time onsite with Raff Printing last week

3.  The 2nd Cover Feeder needs a new motor per Raff Printing last week

4.  The Signature Feeder in the 8th position needs a new relay per Raff Printing this morning

5.  I've identified the automation capabilities ST-400 machines have per conversations with Raff's Operator; in its current state, the automation is "whole" barring the observations above that the 2nd Cover Feeder needs some T.L.C. before it would integrate back into the CPUs automation software

6.  You'll see that the machine's payment terms – like we discussed – are broken up into (3) streams: a deposit down, money at shipment, and a balance outstanding until the machine is installed, and you're running jobs; this is standard policy for the 150 – 175 machine sales we do each year

7.  If you'd like the machine cleaned down top-to-bottom – which I think you will – we'll need about (2) business weeks to finish wiping down; I've annotated this note in the "Machine Will be Ready for Shipment…" section

8.  There is no HST, GST tax when purchasing from U.S.-based companies; however, you are responsible for claiming this machine under the rules of Canadian Tax Law (which, traditionally, other Printers have stated the tax is recuperated for all Bindery, and Graphic Arts machinery purchases)

Print out, review, and tap me an email, or give me a shout in the A.M.

For now, here's a side-by-side of a Feeder that's been cleaned versus a Feeder that's "As Is,"

**A.J. Brahm, Sales Representative**
Best Graphics Group
W222N600 Cheaney Drive | Waukesha, WI 53186
(800) 236-7603 x101 Toll Free
(262) 402-8743 Mobile
(262) 522-3280 Fax
www.BestGraphics.Net
Take Our Virtual Tour

15.     Mr. McDonald relied on Best Graphics' representations about the condition of the Machine.

QB\56410280.2

16.     On October 17, 2018, Ampersand and Best Graphics entered into a Purchase Agreement (the "Agreement") under which Best Graphics sold the Machine to Ampersand for a total unit and shipping cost of $60,500.[1]

17.     On November 15, 2018, the Machine arrived at Ampersand's facility.

18.     Immediately upon inspection, Mr. McDonald notified Best Graphics that the Machine's main stitching unit was damaged, stating "the entire electrical cabinet has been pushed back and down on one side."

19.     Mr. Brahm reassured Mr. McDonald that the damage was cosmetic and Mr. Brahm told him to continue with the Machine's installation.

20.     When the Machine was fully installed and powered, Mr. McDonald noticed several undisclosed problems with the Machine's functionality, including the following components:

   a) **Feeders** - the Machine only had 6 functioning feeders, rather than the 8 feeders Best Graphics represented; both UFA format motors and both TAS format motors were nonoperational;

   b) **Automation** - the Machine's automation was not functional in 5 feeders so the feeders only operated manually; 6 of the format motors were in poor condition; the canbus cables were missing;

   c) **Intermediate Unit** - the Machine's electrical cabinet was badly damaged causing misalignment of connected saddle components; the rear chain pulled from the saddle at 0.5";

   d) **Stitching Unit** - the Machine's lower clincher assembly bearings/brushings were in poor condition, causing significant play in the stitch; the upper stitching head driver assembly rod ends were in poor condition, causing significant play in the stitch; the Machine could not close staples; oil leaked in the main gear box;

   e) **Auxiliary** - the Machine's slave blower was not operational; the inverter was not operational;

---

[1] The Agreement originally included optional installation costs but Ampersand subsequently opted to use a different company for installation.

      f) **Control** - the Machine's control panel consistently displayed an inverter communication error on start-up.

21.      Mr. McDonald further discovered the main stitching assembly bearings were broken and required replacement.

22.      Mr. McDonald contacted the Machine's manufacturer, Mueller Martini Corporation ("Mueller Martini"), for a repair quote.

23.      Mueller Martini's manager then explained to Mr. McDonald that Mueller Martini had previously attempted to repair the exact Machine at the facility of the previous owner, Raff Printing, but discovered the Machine was not salvageable because it required over $343,076 in total repairs.

24.      On December 21, 2018, Mr. Brahm admitted, via email, that Mr. McDonald was "correct that the machine was owned, and utilized by Raff Printing prior to being traded in to Best Graphics."

25.      Upon information and belief, Raff Printing sold the Machine to Best Graphics in a condition that was not suitable for resale.

26.      Mueller Martini declined to repair the Machine because the Machine's condition is so systemically flawed that repairs will not get the Machine to minimum operational standards.

27.      In its current condition, the Machine does not operate as designed because it cannot bind or staple paper products.

28.      Accordingly, the Machine is useless to Ampersand and its only value is in scrap metal.

29.      To date, Ampersand has expended a total of $93,118.54 related to the Machine, including, but not limited to, $52,600 purchase price, $21,848.22 compressor, $15,000 installation, and $3,670.32 to re-install Ampersand's previous saddle stitcher.

QB\56410280.2

## Count I
## (Violation of Wis. Stat. § 100.18)

30.     Ampersand incorporates the paragraphs above as though fully restated herein.

31.     Best Graphics made representations of fact, verbally, in writing, and in its advertising, to Ampersand regarding the condition of the Machine with the intent to sell the Machine to Ampersand.

32.     The representations made by Best Graphics include but are not limited to (1) the Machine had no mechanically/electronically limiting issues and "No issues governing the machine's speed"; (2) Mr. Brahm would circle back with his team and Raff Printing to make sure there was a clear understanding on the Machine's functionality by speaking with the operator to determine which components were operational and which components were not working; (3) the Machine had 8 operational feeders; (4) Best Graphics identified the Machine's automation capabilities through conversations with Raff's operator; (5) "in its current state, the [Machine's] automation is 'whole' barring the observations above that the 2nd Cover Feeder needs some T.L.C. before it would integrate back into the CPUs automation software"; and (6) the low-usage advertisement on Best Graphics' website as a "Approx. Book Count: 75,000,000 - *Single Shift Operation.*"

33.     Best Graphics' representations were untrue, deceptive, and/or misleading as to the true condition of the Machine.

34.     Best Graphics' representations materially induced Ampersand to purchase the Machine.

35.     As a direct and proximate result of Best Graphics' representations, Ampersand incurred pecuniary losses.

-8-

36.     Therefore, Ampersand is entitled to recover for pecuniary losses, costs, and reasonable attorney fees in an amount to be determined at trial.

<u>**Count II**</u>
**(Breach of the Implied Covenant of Good Faith & Fair Dealing)**

37.     Ampersand incorporates the paragraphs above as though fully restated herein.

38.     Best Graphics owed a duty to Ampersand to act in good faith and deal fairly by selling the Machine in a functional condition and/or warning Ampersand of any defects in the Machine.

39.     Best Graphics violated and intentionally neglected its duties under the Agreement by misrepresenting the Machine's condition, failing to properly inspect the Machine, and failing to disclose an improper inspection of the Machine, and Best Graphics' bad faith and unfair conduct thwarted Ampersand's reasonable expectations under the Agreement.

40.     As a direct and proximate result of Best Graphics' violation of the implied duty of good faith and air dealing, Ampersand has suffered and will continue to suffer significant damages.

41.     Therefore, Ampersand is entitled to recover its damages in an amount to be determined at trial.

QB\56410280.2

**WHEREFORE**, Plaintiff Ampersand respectfully requests this Court to enter judgment in Ampersand's favor as follows:

a)      awarding a money judgment for damages, in an amount to be determined by the trier of fact, including all amounts Plaintiff is entitled to recover for consequential and/or punitive damages;

b)      awarding all attorney fees and expenses incurred in this action as allowed by law;

c)      awarding all interest on the above amounts allowed by law, including pre- and post-judgment interest; and

d)      awarding such other and further relief as this Court deems necessary, proper, and just.

## Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ampersand hereby requests trial by jury of all issues triable in this action.

Dated this 16th day of April, 2019.

QUARLES & BRADY LLP

*Electronically signed by Averi A. Niemuth*

Kevin M. Long (SBN 1018128)
Averi A. Niemuth (SBN 1102411)
411 East Wisconsin Avenue, Suite 2350
Milwaukee, Wisconsin  53202
Telephone:  (414) 277-5163
Facsimile:  (414) 978-8963
E-mail: kevin.long@quarles.com

*Attorneys for Plaintiff Subtractus, Inc. d/b/a Ampersand*

-10-